UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| W. P. CAREY, INC., | |
| Plaintiff, | |
| -v.- | |
| DEBRA E. BIGLER, | |
| Defendant. | |

18 Civ. 585 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

To Plaintiff W. P. Carey ("WPC"), this is a case of no good deed going unpunished. In April 2015, WPC's subsidiary, Carey Financial, LLC ("Carey Financial"), dealt with an ostensibly underperforming employee, Debra E. Bigler, by engineering a soft landing for her in the form of a two-year specialized employment contract. When the two-year period came to an end in April 2017, Bigler left her position at Carey Financial without incident and executed a letter agreement (the "Letter Agreement") in which, among other things, she released all claims against WPC and Carey Financial in exchange for consideration that included six months of continued medical and dental benefits. However, the day after the benefits ran out, Bigler filed an arbitration proceeding naming WPC and Carey Financial, seemingly in violation of the Agreement. WPC seeks in this action to compel Bigler's adherence to the Letter Agreement and to punish her violations to date.

To Defendant Debra E. Bigler, this is a case of deception and evasion by her former employer and its parent company. According to Bigler, WPC knew in the spring of 2017 of plans to close down the bulk of its operations at Carey

Financial, and further knew that Bigler was entitled to notice (if not compensation) in connection with those plans under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109, and its New York analogue, N.Y. Lab. Law §§ 860(a)-860(i).[1]  Because WPC kept this information from Bigler during her severance discussions, it is argued, the Letter Agreement is invalid and Bigler is entitled to pursue arbitral remedies for WARN notice violations and employment discrimination.

These narratives are mutually contradictory.  Both sides cannot be right.  And though it is early in this litigation, WPC has moved for summary judgment on its claims for declaratory and other relief.  Bigler, in opposition, seeks to compel WPC to participate in the arbitration proceeding she filed.  Even drawing all inferences in Bigler's favor, the record before this Court makes plain that WPC was *not* required to give notice or compensation under the WARN Act to Bigler in April 2017, or at any time thereafter.  Since that is the basis of Bigler's fraudulent inducement claim, there is similarly no basis to invalidate the Letter Agreement that Bigler signed or its release and waiver of suit provision.

The Court recognizes that, in so concluding, it is depriving Bigler of an opportunity to conduct further discovery in this matter.  However, Bigler has failed to identify any discovery that would controvert, or even raise a genuine dispute of material fact concerning, the evidence that is currently in the record.

---

[1]     Because of the similarities between the two acts, references in this Opinion to the "WARN Act" or "WARN notice" should be deemed to include both statutes.

Accordingly, Bigler's motion to compel arbitration and/or to dismiss is denied, and WPC's motion for summary judgment is granted.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Parties

W. P. Carey is a real estate investment trust with its principal place of business in New York, New York.  (Compl. ¶ 7; Pl. 56.1 ¶ 1).  It is the corporate

---

[2]    The facts set forth in this Opinion are drawn from the Complaint ("Compl." (Dkt. #1)); the parties' statements pursuant to Local Rule 56.1 (Dkt. #33, 36); and the exhibits to the various declarations submitted in connection with the instant motions to compel and for summary judgment (*see, e.g.*, Dkt. #24, 25, 26, 29, 30, 31, 32, 37, 38, 40, 41, 44).  Declarations are cited using the convention "[Name] Decl.," with additional identifying information for declarants who submitted more that one declaration in this matter.  Defendant Bigler submitted declarations in support of her motion to compel arbitration (Dkt. #38), and in opposition to Plaintiff W. P. Carey's motion for summary judgment (Dkt. #41), but the Court understands the two docket entries to contain the identical declaration.

For ease of reference, Defendant Bigler's memorandum in support of her motion to compel arbitration is referred to as "Def. Br." (Dkt. #26); Plaintiff W. P. Carey's memorandum in opposition to the motion and in support of its cross-motion for summary judgment is referred to as "Pl. Br." (Dkt. #28, repeated at Dkt. #31); Defendant's reply memorandum and memorandum in opposition to Plaintiff's summary judgment motion is referred to as "Def. Reply" (Dkt. #39, repeated at Dkt. #42); and Plaintiff's reply memorandum is referred to as "Pl. Reply" (Dkt. #43).  The parties' Local Rule 56.1 statements are referred to as "Pl. 56.1" (Dkt. #33) and "Def. 56.1 Opp." (Dkt. #36).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a party's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the other party, the Court finds such fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

parent of Carey Financial, which maintains its principal place of business in the same office space. (*Id.*).

Bigler is a citizen of Florida who was previously employed by WPC and Carey Financial. (Compl. ¶ 8). From 1989 to 2015, she served in a number of positions and traveled between her local office in Boca Raton and the New York office. (*Id.* at ¶ 11; Bigler Decl. ¶ 3).

### 2. Carey Financial's 2015 Employment Offer and the April 2017 Letter Agreement

In 2015, Bigler's supervisor, Trisha Miller, offered her a choice between two job options, neither of which could fairly be viewed as a promotion: Bigler could go on a "performance improvement plan," during which a failure to meet certain employment-related goals could result in termination, or she could accept a two-year position as an "Ameriprise Ambassador" planning events to celebrate the 25th anniversary of WPC's and Carey Financial's relationship with their client, Ameriprise. (Pl. 56.1 ¶ 2). On April 23, 2015, Bigler accepted the two-year position after reviewing a formal email offer from Miller intended to "incorporate [their] recent discussions and ... to summarize and memorialize the terms of the opportunity [they] discussed." (*Id.*; Compl., Ex. B).[3]

In that email, Miller explained that although Carey Financial "would consider whether any new position might be available at the end of the second year, our current expectation, which we have discussed with you, is that your

---

[3]    Neither party suggests that there were subsequent oral or written communications modifying Miller's email, and so the Court considers this email to be the memorialization of that agreement.

employment relationship with [Carey Financial] would come to an end at the conclusion of the two-year period." (Compl., Ex. B). At that point Carey Financial "would be prepared to offer ... continued health insurance coverage through the age of 65, which would not include any other severance payment." (*Id.*). The email stated that Bigler's compensation "would extend through the end of April, 2017," but that both Bigler and Carey Financial reserved the right to end her employment at any time during the period. (*Id.*).

Bigler remained in the position for two years, through April 2017. At that time, she was informed by Miller that her employment was terminated, and was presented with a written separation letter dated April 13, 2017 (the "Letter Agreement"). (Pl. 56.1 ¶ 3; Miller Decl. ¶ 9 & Ex. A). The Letter Agreement recited that Bigler's employment with Carey Financial would end at the close of the business day on April 30, 2017. (Miller Decl., Ex. A at ¶ 1). As a separation benefit, if Bigler signed the Letter Agreement and complied with its terms, Carey Financial agreed to pay her health and dental insurance premiums, including coverage for eligible dependents, through November 30, 2017. (*Id.* at ¶ 2). These terms included a covenant not to sue Carey Financial and each of its parent companies with respect to "any and all claims," including but not limited to claims based on federal, state, or local statutes relating to employment, age discrimination, sex discrimination, or other forms of discrimination. (*Id.* at ¶ 4).

Bigler was given twenty-one days to review the Letter Agreement and seven days to revoke the agreement after she signed it. (Pl. 56.1 ¶¶ 3-4). She

signed the Letter Agreement on May 3, 2017, and did not revoke it. (*Id.*).

Bigler received the cost of health and dental insurance coverage from April 30,

2017, through November 30, 2017. (Pl. 56.1 ¶ 4).

### 3. WPC's June 2017 Reduction in Force

On June 15, 2017, WPC announced that its Board of Directors had

approved "a plan to exit all non-traded retail fundraising activities" carried out

"by its wholly-owned broker-dealer subsidiary, Carey Financial LLC, effective

June 30, 2017." (Compl., Ex. D; Pl. 56.1 ¶ 5). On that same day, WPC filed a

WARN notice with the New York Department of Labor ("NYDOL"), announcing

that it was undertaking a "plant unit closing" of Carey Financial, with

terminations of sixty affected employees commencing June 30, 2017. (Compl.,

Ex. C; Pl. 56.1 ¶ 5). *See* 29 U.S.C. § 2102(a)(2) (requiring that notice of plant

closing or mass layoff be given to each state where closing or layoff will occur).

Bigler's supervisor, Carey Financial CEO Trisha Miller, was one of the

affected employees who received her WARN notice on June 15, 2017, which "to

[Miller's] understanding, is the same day on which all other Carey Financial

employees received notice." (Miller Decl. ¶ 11). The Managing Director and

Chief Administrative Officer of WPC, Susan Hyde, confirms that WPC provided

WARN notice to the sixty affected employees of Carey Financial on June 15.

(Hyde SJ Decl. ¶ 5). No notice was given to any employees or regulators prior

to that date. (*Id.* at ¶ 7; Pl. 56.1 ¶ 6). Employees affected by the reduction in

force were provided either with notice or with pay in lieu of notice in

compliance with WARN and its New York state law counterpart.  (Hyde SJ Decl. ¶ 8).

### 4. The FINRA Arbitration

One day after her separation benefits ended — on December 1, 2017 — Bigler filed an arbitration under the auspices of the Financial Industry Regulatory Authority, Inc. ("FINRA") against WPC and Carey Financial.  (Pl. 56.1 ¶ 7).[4]  In the FINRA proceeding, Bigler claimed violations of New York State and City discrimination laws on account of her age and sex, violations of the federal and state WARN statutes, and fraud in the inducement and misrepresentation regarding Bigler's signing of the Letter Agreement.  (*See* Gerrald Arb. Decl., Ex. C (Statement of Claim); *see also* Pl. Br. 1).  On the latter point, Bigler argued that the Letter Agreement (and, more particularly, its release and waiver of suit provision) was invalid because WPC and Carey Financial had not given her notice, in April 2017, of the June 2017 reduction in force at Carey Financial.  (Gerrald Arb. Decl., Ex. C at ¶¶ 92-101).  Indeed, Bigler alleged a concerted effort by WPC and Carey Financial to deprive her of such notice, so that she would leave Carey Financial without receiving the enhanced severance benefits to which she was entitled.  (*Id.* at ¶ 37).

Carey Financial had previously executed a commission agreement with Bigler (the "Commission Agreement") that contained an arbitration clause; it therefore entered an appearance in the FINRA arbitration.  (Gerrald Arb. Decl.,

---

[4]    The Statement of Claim submitted in connection with the arbitration is dated November 28, 2017.  (Gerrald Arb. Decl., Ex. C).

Ex. A at ¶ 10(d) (Commission Agreement), Ex. D (Carey Financial counterclaim)). WPC — a nonsignatory to the Commission Agreement — has not appeared. (*Id.*, Ex. J). In a letter to Bigler's attorney, the FINRA Office of Dispute Resolution advised that WPC "is not compelled by the Code of Arbitration Procedure to arbitrate disputes with [Bigler] in this forum," and, further, that since WPC did not voluntarily submit to FINRA's jurisdiction, the arbitration panel had no power to render an enforceable award against WPC. (*Id.*).

In her Statement of Claim, Bigler alleged "upon information and belief" that "all employees of Carey Financial were given notice at least 60 days prior to the mass layoff, i.e. by April 16th at the latest." (Gerrald Arb. Decl., Ex. C at ¶ 33). Bigler clarifies the basis for this understanding in her declaration to this Court: Bigler recalls that she "was told" by entities unknown that "there were internal meetings and discussions" regarding a reduction in force at Carey Financial at some point prior to the event. (Bigler Decl. ¶ 30). Bigler also recalls "talks" about a reduction in force of which she was informed "by those who attended the national sales meeting" in early May 2017. (*Id.* at ¶ 31).

**B.    Procedural Background**

WPC commenced this action on January 23, 2018, after the FINRA arbitration was filed. (Dkt. #1). In its Complaint, WPC claims that Bigler breached the covenant not to sue in the Letter Agreement, and seeks a declaratory judgment that the Letter Agreement is valid and that Bigler had validly released the precise claims she filed in the FINRA arbitration. (Compl.

¶¶ 38-49).  WPC seeks declaratory relief, monetary damages (including attorneys' fees), and interest.  (*Id.* at ¶ 49).  In a procedurally unconventional move, WPC also filed a motion for summary judgment in tandem with the Complaint.  (Dkt. #5-9).

On February 28, 2018, this Court held an initial pretrial conference to discuss WPC's motion for summary judgment as well as Bigler's proposed motion to stay or, alternatively, to compel arbitration of WPC's claims.  (*See* Dkt. #21 (transcript of Feb. 28, 2018 conference)).  Later that day, the Court issued an order setting a briefing schedule for the parties' motions and denied without prejudice WPC's motion for summary judgment.  (Dkt. #20).

Bigler filed her motion to compel arbitration and, in the alternative, to dismiss for lack of subject matter jurisdiction and supporting papers on March 30, 2018.  (Dkt. #23-26).  WPC filed its motion for summary judgment and its opposition to Bigler's motion, along with supporting papers, on April 30, 2018.  (Dkt. #27-33).  Bigler filed her joint opposition to WPC's motion and reply to her motion on May 31, 2018.  (Dkt. #36-42).  WPC filed the reply to its motion on June 13, 2018.  (Dkt. #43).

## DISCUSSION

### A.    The Court Denies Bigler's Motion to Compel Arbitration

#### 1.    Applicable Law

Because resolution of Bigler's motion to compel arbitration could potentially moot WPC's summary judgment motion, the Court addresses it first.  The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), "reflects a

liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted); *see generally Metro. Life Ins. Co.* v. *Bucsek,* No. 17-881, 2019 WL 1303047, at *3 (2d Cir. Mar. 22, 2019). Section 2 of the FAA provides, "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement. *Id.* § 4.

But while there is a federal policy favoring arbitration, it is also the case, generally speaking, that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Exceptions to this rule arise where "ordinary principles of contract and agency" dictate that a nonsignatory should be bound to an arbitration agreement. *Thomson-CSF, S.A.* v. *Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995) (citing *McAllister Bros., Inc.* v. *A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)).

A court considering a petition to compel arbitration must thus decide two issues: "[i] whether a valid agreement or obligation to arbitrate exists, and [ii] whether one party to the agreement has failed, neglected, or refused to

arbitrate." *Ngo* v. *Oppenheimer & Co.*, No. 17 Civ. 1727 (GHW), 2017 WL 5956772, at *2 (S.D.N.Y. Nov. 30, 2017) (quoting *Isaacs* v. *OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 566-67 (S.D.N.Y. 2013)). Where a court holds that an arbitration agreement is valid and the claims before it are arbitrable, it must stay or dismiss the litigation and send the dispute to arbitration. (*Id.* (quoting *Patterson* v. *Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015))).

A court resolving a motion to compel arbitration applies a standard similar to that for summary judgment. *Meyer*, 868 F.3d at 74 (quoting *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). In doing so, "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks, alterations, and citations omitted). Courts do not apply the presumption of arbitrability to "disputes concerning whether an agreement to arbitrate has been made." *Goldman, Sachs & Co.* v. *Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (quoting *Applied Energetics, Inc.* v. *NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)). That is because "[i]t is the court's duty to interpret and construe an arbitration provision, but only where a contract is 'validly formed' and 'legally enforceable.'" *Kulig* v. *Midland Funding, LLC*, No. 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013) (internal citations omitted); *accord Application of Whitehaven S.F., LLC* v. *Spangler*, 45 F. Supp. 3d 333, 343 (S.D.N.Y. 2014).

## 2. Discussion

WPC does not dispute the validity of the arbitration agreement between Bigler and Carey Financial, but merely its enforceability as to WPC. The Second Circuit has recognized five theories under which nonsignatories may be bound to the arbitration agreements of others: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ego; and (v) estoppel. *See Thomson-CSF*, 64 F.3d at 776; *see also Kwatinetz* v. *Mason*, 356 F. Supp. 3d 343, 348 (S.D.N.Y. 2018). The party seeking to arbitrate with a nonsignatory bears the burden of proving that the circumstances of its case fall within one or more of the five listed theories. *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO* v. *Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004).

Bigler contends that even though WPC is a nonsignatory to her Commission Agreement with Carey Financial, it is bound to arbitrate under theories of assumption, agency, veil-piercing/alter ego, and estoppel. (Def. Br. 9-13). The Court will examine these theories and their applicability to this case in turn.

### a. Assumption

"In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF*, 64 F.3d at 777 (citing *Gvozdenovic* v. *United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991)). Here, as in *Thomson-CSF*, WPC's subsequent conduct does not manifest an intent to be obligated to arbitrate. Quite to the contrary, when the arbitration was initiated, WPC did

not appear before FINRA, but rather commenced this action seeking an order that it is not bound to arbitrate. As WPC has not manifested "a clear intent to arbitrate," it is not bound to do so under an assumption theory. *Gvozdenovic*, 933 F.2d at 1105.

### b. Agency

"Traditional principles of agency law may bind a nonsignatory to an arbitration agreement." *Thomson-CSF*, 64 F.3d at 777. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." RESTATEMENT (SECOND) OF AGENCY § 1 (1958). According to Bigler, agency between WPC and Carey Financial is premised on their corporate relationship — the fact that WPC wholly owns and is the corporate parent of Carey Financial.

In *Thomson-CSF*, the mutual benefits derived from affiliation were determined to be insufficient to bind a nonsignatory to an arbitration agreement signed by an affiliate. The district court there had compelled the parent corporation to arbitrate with Evans & Sutherland Computer Corporation ("E&S") on the basis of an arbitration agreement between E&S and the subsidiary corporation. In so doing, the district court had applied a "hybrid" approach to compel arbitration by the parent nonsignatory, relying on: (i) the parent's common ownership of the subsidiary; (ii) the parent's actual control of the subsidiary; (iii) the parent's notice of the agreement to arbitrate prior to purchasing the subsidiary; (iv) E&S's express intention to bind the

parent to the agreement to arbitrate; (v) the parent's incorporation of the subsidiary into its own organizational and decision-making structure; and (vi) the parent's benefit from that incorporation. *Thomson-CSF*, 64 F.3d at 780. The Second Circuit soundly rejected this approach:

> The district court's [] approach dilutes the safeguards afforded to a nonsignatory by the "ordinary principles of contract and agency" and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements. Anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations.

*Id.*

Thus, an agency theory premised solely on affiliation between parent and subsidiary — which is the core of Bigler's argument — is insufficient to bind a nonsignatory parent under Second Circuit law. *See also Merrill Lynch Inv. Managers* v. *Optibase Ltd.*, 337 F.3d 125, 130-31 (2d Cir. 2003). Bigler offers no facts to support the assertion that Carey Financial consented to control by WPC, or that WPC acted on Carey Financial's behalf in any significant manner. Therefore, WPC is not bound by its subsidiary's agreement to arbitrate on an agency theory.

### c.     Veil-Piercing/Alter Ego

"[A] parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness." *Thomson-CSF*, 64 F.3d at 778. Under New York law, "piercing the corporate veil requires a showing that: [i] the owners exercised complete

14

domination of the corporation in respect to the transaction attacked; and [ii] that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Oppenheimer & Co. Inc.* v. *Deutsche Bank AG*, No. 09 Civ. 8154 (LAP), 2010 WL 743915, at *4 (S.D.N.Y. Mar. 2, 2010) (citing *Morris* v. *N.Y.S. Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141 (1993)).

This inquiry is fact-specific.  Courts have considered the following factors in determining whether one corporation completely dominates another:

> [i] disregard of corporate formalities; [ii] inadequate capitalization; [iii] intermingling of funds; [iv] overlap in ownership, officers, directors, and personnel; [v] common office space, address and telephone numbers of corporate entities; [vi] the degree of discretion shown by the allegedly dominated corporation; [vii] whether the dealings between the entities are at arms length; [viii] whether the corporations are treated as independent profit centers; [ix] payment or guarantee of the corporation's debts by the dominating entity, and [x] intermingling of property between the entities.

*MAG Portfolio Consultant, GMBH* v. *Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001).  Even where several of these factors cut in favor of piercing the corporate veil, courts are reluctant to do so where evidence of domination is incomplete.  *See Lakah* v. *UBS AG*, 996 F. Supp. 2d 250, 267 (S.D.N.Y. 2014) ("It is a remedy undertaken with extreme reluctance ... even where multiple *Portfolio Consult* factors cut in favor of piercing the corporate veil[.]"); *see also Am. Fuel Corp.* v. *Utah Energy Develop. Co.*, 122 F.3d 130, 134-35 (2d Cir. 1997) (declining to pierce even where the corporation was a shell with no

15

contracts, employees, independent office space, independent bank account, capital, or assets, and where the business expenses were paid out of pocket by the owner).

Bigler alleges that WPC and Carey Financial maintained a common address, telephone number, common stationery, and email signature; that Trisha Miller was an overlapping officer at both corporations; and that they shared payroll and human resources support. (Def. Br. 12-13; Bigler Decl. ¶¶ 4-7, 11-12; Lader Decl. ¶¶ 3-4). Even if true, this is far from the requisite showing needed to merit veil-piercing. Bigler did not — and indeed, cannot — allege that Carey Financial was under-capitalized; as a broker-dealer registered with the U.S. Securities and Exchange Commission and FINRA, it was required to maintain certain minimum net capital levels on its own. *See Oppenheimer*, 2010 WL 743915, at *2 (noting that subsidiary registered as a broker-dealer was "required to maintain minimum regulatory capital levels"). She also cannot show that corporate formalities were disregarded, that Carey Financial had restricted discretion, that the dealings between the corporations were not at arm's length, or that other indicia of corporate domination are present. Carey Financial has maintained its own board of managers (containing one independent manager out of three to five total managers); it holds its own board meetings separate from WPC's and keeps its own minutes; it maintains its own books and financial statements; it is independently audited; it maintains its own independent capitalization; and it does not commingle funds with WPC's funds. (*See* Hyde Arb. Decl. ¶¶ 4-14).

Even if Bigler had alleged adequately that WPC exercised "complete domination" of Carey Financial, she has not alleged that this domination was "used to commit a fraud or wrong" against Bigler that resulted in her injury. *See Oppenheimer*, 2010 WL 743915, at *4; *Elec. Switching Indus., Inc.* v. *Faradyne Elec. Corp.*, 833 F.2d 418 (2d Cir. 1987) ("Even assuming ... that plaintiff showed complete control and domination of [corporation] by [parent corporations], so that [corporation] had no separate mind, will, or existence of its own, plaintiff failed to allege or prove that this control and domination was used to commit wrong, fraud, or the breach of a legal duty ... and that the control and breach of duty proximately caused the injury complained of. Absent such a showing, New York law will not allow a piercing of the corporate veil."). There are no allegations here that WPC abused the corporate form in some manner to perpetuate a wrong, fraud, or breach on Bigler. Although Bigler complains of "false representations and intentional omissions of material fact made by Carey Financial and WPC" that "induced her to sign the Letter Agreement" (Def. Br. 6; *see also* Bigler Decl. ¶ 38; Gerrald Arb. Decl., Ex. C) — namely, the failure to give her notice that Carey Financial would undertake a plant closing in mid-June 2017 — there is no connection between those alleged wrongs and any abuse of the corporate form by WPC.

In short, contrary to Bigler's argument, Carey Financial is not WPC's alter ego, and there is not a sufficient nexus between their ordinary parent-subsidiary relationship and any alleged wrong experienced by Bigler. She has

therefore failed to make the "full showing" necessary to compel WPC to arbitrate under this theory. *Thomson-CSF*, 64 F.3d at 780.

### d. Estoppel

Bigler's final claim to compel arbitration stems from a theory of estoppel. A nonsignatory may be estopped from avoiding arbitration where it "knowingly accepted the benefits" of an agreement with an arbitration clause. *MAG Portfolio*, 268 F.3d at 61; *see also Deloitte Noraudit A/S* v. *Deloitte Haskins Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). However, the benefits to the nonsignatory must flow directly from the agreement to estop the nonsignatory. *Thomson-CSF*, 64 F.3d at 779; *see also Am. Bureau of Shipping* v. *Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999); *Kwatinetz*, 356 F. Supp. 3d at 350-51. Put somewhat differently, the benefit derived from an agreement is "indirect," and therefore insufficient to support estoppel, "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio*, 268 F.3d at 61 (citing *Thomson-CSF*, 64 F.3d at 778-79).

Bigler argues that "WPC should be required to arbitrate under the estoppel theory" because "[t]he Commission Agreement between Bigler and Carey Financial containing the arbitration clause provides that the Employer receives benefits in the form of certain services of Bigler." (Def. Br. 13). This argument accurately recites the language of the Commission Agreement, but overlooks the fact that the same agreement only identifies "Carey Financial, LLC" as the "Employer." Undeterred, Bigler argues that WPC has

acknowledged that "WPC, in addition to Carey Financial, was also Bigler's employer." (*Id.* at 14 (citing Compl. ¶ 8); *see also* Def. Reply 10 (repeating arguments)). However, the cited paragraph of the Complaint states only that "Defendant Debra E. Bigler is a citizen of Florida who was previously employed by WPC and Carey Financial" (Compl. ¶ 8); the remainder of the Complaint makes clear that, at all relevant times, Bigler was an employee of Carey Financial (*see, e.g.*, *id.* at ¶¶ 1-2, 11-12). In any event, the portion of the Complaint cited by Bigler does not purport to interpret the Commission Agreement or to identify the parties thereto.

Bigler cannot demonstrate that WPC knowingly accepted and assumed the benefits of her agreement to arbitrate with Carey Financial, her sole employer since 2012. (*See* Gerrald Arb. Decl., Ex. C at ¶ 15 ("In or about 2012, [Bigler] was no longer receiving her compensation from [WPC] and began receiving her compensation from Carey Financial.")). The only benefits that WPC could be said to have gained from Bigler's 2014 Commission Agreement with Carey Financial are the benefits that any parent corporation would gain from an agreement executed by any subsidiary. The indirect benefit that Bigler asserts is not the sort of benefit that the Second Circuit has recognized as a basis for estopping a nonsignatory from avoiding arbitration. *See Thomson-CSF*, 64 F.3d at 778-79 (discussing *Deloitte Noraudit A/S*, 9 F.3d 1060).

Had WPC benefitted from the Commission Agreement in the terms of the Agreement itself, it would perhaps be estopped from avoiding arbitration. As it stands, the benefits that Bigler asserts — her work for Carey Financial that

may have benefitted WPC — are general and do not arise from the Commission Agreement.  Thus, WPC is not bound by its subsidiary's agreement to arbitrate with an employee.  More broadly, given the failure of each of Bigler's proffered bases to compel arbitration, this Court will not extend the arbitration provision to bind WPC, and it denies Bigler's motion to compel.[5]

## B.     The Court Exercises Its Discretion Not to Stay This Litigation

Bigler argues that if this Court declines to compel WPC to arbitrate, at the very least it should stay this litigation pending the outcome of the arbitration between Bigler and Carey Financial.  (Def. Br. 3).  She marshals three reasons why a stay would be appropriate: (i) it is a waste of this Court's time and resources to litigate a matter with a pending arbitration on the same issues; (ii) the "frivolity" of this action is apparent because WPC is seeking the same relief that its subsidiary seeks in arbitration; and (iii) there is "no legitimate reason" why WPC should be permitted to litigate in federal court while its subsidiary handles duplicative claims in arbitration.  (*Id.*).  The Court rejects all three reasons, and exercises its discretion not to stay the matter.

### 1.     Applicable Law

Within a court's inherent power to manage its docket is the discretion to stay non-arbitrable claims to await the conclusion of pending arbitration, even where the parties in the litigation and the arbitration are not identical.  *BSG Res. (Guinea) Ltd.* v. *Soros*, No. 17 Civ. 2726 (JFK), 2017 WL 5897450, at *3

---

[5]     Bigler does not argue, and the Court therefore does not consider, whether any particular functions or tasks she performed during her employment by Carey Financial, including her work as an "Ameriprise Ambassador," would alter the estoppel analysis.

(S.D.N.Y. Nov. 29, 2017) (citing *Alghanim* v. *Alghanim*, 828 F. Supp. 2d 636, 664-65 (S.D.N.Y. 2011)). As a threshold matter, the movant seeking the stay must establish that "there are issues common to the arbitration and the court proceeding," and that "those issues will finally be determined by arbitration." *Am. Shipping Line, Inc.* v. *Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995) (citing *Sierra Rutile Ltd.* v. *Katz*, 937 F.2d 743, 750 (2d Cir. 1991)).

If that burden can be satisfied, then the movant must show that "the non-arbitrating party will not hinder the arbitration, that the arbitration will be resolved within a reasonable time, and that such delay that may occur will not cause undue hardship to the non-moving parties." *Am. Shipping Line*, 885 F. Supp. at 502. Stays are particularly appropriate where they may promote judicial economy, potentially clarify the issues involved, or avoid possible inconsistent results between proceedings. *Birmingham Assocs. Ltd.* v. *Abbott Labs.*, 547 F. Supp. 2d 295, 302 (S.D.N.Y. 2008) (internal citation omitted). Stays are less appropriate where arbitration will not decide the issues common to both the arbitration and the court proceedings, where the plaintiff will face undue hardship, or where a stay will unduly delay court proceedings. *See, e.g.*, *Am. Shipping Line*, 885 F. Supp. at 502-03 (discussing compelling reasons to stay).

### 2. Discussion

Bigler's position boils down to two broad concerns, both of which are exhaustively discussed in the case law: (i) conserving judicial economy, and

(ii) anxieties related to possibly inconsistent results. *See BSG Res. (Guinea) Ltd.*, 2017 WL 5897450, at *3 (citing *Birmingham Assocs. Ltd.*, 547 F. Supp. 2d at 302); *Alghanim*, 828 F. Supp. 2d at 665 (internal citation omitted); *Louis Berger Grp., Inc.* v. *State Bank of India*, 802 F. Supp. 2d 482, 490 (S.D.N.Y. 2011). Under the circumstances presented here, the first concern is unwarranted: any judicial resources that might be preserved by a stay have already been expended in the resolution of the instant motions.

As for the second concern, it cannot be said here that "the arbitration's result will provide significant insight into the related claim asserted in this action." *See Iusacell, S.A. de C.V.* v. *Int'l Bus. Machines Corp.*, No. 14 Civ. 2697 (NRB), 2014 WL 6491757, at *7 (S.D.N.Y. Nov. 14, 2014) (internal citation omitted). The only way the arbitration between Bigler and Carey Financial might have relevance to this litigation is if the arbitrator were to find that Bigler had indeed been fraudulently induced to sign the Letter Agreement. But, for the reasons articulated *infra*, Bigler's fraudulent inducement theory is without merit, and fails as a matter of law.

Further, Bigler has not shown that the arbitration will be resolved within a reasonable time, nor has she shown that the delay that may occur due to arbitration will not cause undue hardship to WPC. *Am. Shipping Line*, 885 F. Supp. at 502. The majority of the claims Bigler brought in arbitration are not pleaded in this lawsuit, though the Court imagines that Bigler might raise them as counterclaims in this case. (*See* Gerrald Arb. Decl., Ex. C (Statement of Claim reciting claims under the Age Discrimination in Employment Act, the

22

New York State Human Rights Law, the New York City Human Rights Law, the WARN Act, the New York State WARN Act)). At base, the Court does not wish to have a litigation with very few issues sidelined by an arbitration with many issues. Given the early stage in the arbitration and FINRA's statements concerning the limits of its power over WPC, as well as all parties' interests in the efficient use of judicial and arbitral resources, the Court declines to stay this matter pending the result of arbitration between Bigler and Carey Financial.

**C.    The Court Denies Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Bigler alternatively moves to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (Def. Br. 15-17). She argues that the amount in controversy does not exceed the $75,000 figure required by the diversity jurisdiction statute, 28 U.S.C. § 1332(a). While a court must always be attentive to issues impacting its jurisdiction, this Court sees no deficiencies in WPC's pleading.

To rebut the presumption that the face of WPC's complaint is a good-faith representation of the amount in controversy, Bigler must "demonstrat[e] to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimus." *Colavito* v. *N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006) (internal quotation marks and citation omitted). In its complaint, WPC seeks (i) declaratory judgment that the release of claims provision in the Letter Agreement is binding on Bigler; (ii) judgment that Bigler breached the covenant

not to sue in the Letter Agreement; (iii) damages incurred as a result of Bigler's breach, including attorneys' fees; (iv) pre- and post-judgment interest; and (v) any further relief that this Court deems just and proper. (Compl. ¶ 49).

In actions seeking declaratory relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation," calculated from the plaintiff's standpoint. *See, e.g.*, *Pyskaty* v. *Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (quoting *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977)). The amount in controversy is not necessarily limited to the value of the money judgment sought, but may encompass as well the value of the consequences that may result from the litigation. *Beacon Const. Co.* v. *Matco Elec. Co.*, 521 F.2d 392, 399 (2d Cir. 1975) (citing *Smith* v. *Adams*, 130 U.S. 167, 175 (1889)). When damages are not requested, "the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy." *Kheel* v. *Port of N.Y. Auth.*, 457 F.2d 46, 49 (2d Cir. 1972).

In this case, a judgment declaring the Letter Agreement valid and releasing the claims asserted by Bigler has a value to WPC well in excess of $75,000. (*See* Pl. Br. 35). After all, Bigler's Statement of Claim seeks several million dollars from WPC and Carey Financial in compensatory and punitive damages. (*See* Gerrald Arb. Decl., Ex. C (Statement of Claim)). Because Bigler cannot demonstrate to a legal certainty that what WPC seeks from this Court can be valued at less than $75,000, the Court finds that the amount in

controversy requirement is met, and that it possesses subject matter jurisdiction to hear WPC's claims.

**D.     The Court Grants WPC's Motion for Summary Judgment**

**1.     Applicable Law**

**a.     The Declaratory Judgment Act**

The Court turns now to WPC's cross-motion for summary judgment on its claims for declaratory relief.  By way of background, the Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  It provides courts a "unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 286 (1995).  That said, the "discretion does not extend to the declaration of rights that do not exist under law....  The [Declaratory Judgment Act] is procedural only, and does not create an independent cause of action."  *Chevron Corp.* v. *Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) (internal quotation marks and citations omitted).

**b.     Summary Judgment Under Fed. R. Civ. P. 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986);

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[6]  A genuine

dispute exists where "the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins.

Co. of N.Y.,* 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks

and citation omitted).  A fact is "material" if it "might affect the outcome of the

suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the

absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers*

*Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477

U.S. at 323), the party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see*

*also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-

moving party "must set forth specific facts showing that there is a genuine

issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins.*

*Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).  The

nonmoving party may not rely on "mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment." *Knight* v.

---

[6]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary
judgment standard from a genuine "issue" of material fact to a genuine "dispute" of
material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting
that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue'
becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment
determination.").  This Court uses the post-amendment standard, but continues to be
guided by pre-amendment Supreme Court and Second Circuit precedent that refers to
"genuine issues of material fact."

*U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

### c.    Summary Judgment Prior to Discovery

Summary judgment may be granted "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).[7] What is more, there is no general

---

[7]    The Committee Notes to the 2009 Amendments state that "[t]he new rule [56] allows a party to move for summary judgment at any time, even as early as the commencement of the action." *See* Fed. R. Civ. P. 56, advisory comm. notes (2009 Amendments). The Committee Notes to the 2010 Amendments qualify the earlier notes: "Although the rule allows a motion for summary judgment to be filed at the commencement of an action, in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had. Scheduling orders or

right to discovery prior to the entry of summary judgment.  *See Ali* v. *City of New York*, No. 11 Civ. 5469 (LAK), 2012 WL 3958154, at *3 & n.10 (S.D.N.Y. Sept. 5, 2012) (collecting cases).  Courts in this Circuit have granted pre-answer motions for summary judgment in certain circumstances.  *See, e.g.*, *Martin* v. *Donahoe*, No. 12 Civ. 672 (JFB), 2016 WL 806871 (E.D.N.Y. Mar. 22, 2013) (granting defendant postmaster general's pre-answer motion for summary judgment against mail handler plaintiff after plaintiff failed to exhaust his administrative remedies under the Rehabilitation Act); *Cobbs* v. *Lamare*, No. 14 Civ. 96 (MAD), 2015 WL 2452323 (N.D.N.Y. May 21, 2015) (district court adopting magistrate judge's recommendation that defendant correctional officer's motion for summary judgment be granted prior to incarcerated plaintiff's answer due to plaintiff's failure to exhaust his administrative remedies); *Wells* v. *Evans*, No. 15 Civ. 6094 (CJS), 2016 WL 806871 (W.D.N.Y. Mar. 2, 2016) (granting correctional staff defendants' pre-answer motion for summary judgment against incarcerated plaintiff due to plaintiff's failure to exhaust administrative remedies and denying plaintiff's procedural due process claim on the merits); *see generally Ali*, 2012 WL 3958154, at *3 n.10 (collecting cases granting summary judgment prior to discovery).  In each case, however, the court has recognized the truism that the grant of summary judgment is not to be undertaken lightly.  *See Hellstrom* v.

---

other pretrial orders can regulate timing to fit the needs of the case."  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments).

*U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (summary judgment to be granted prior to discovery "only in the rarest of cases").

As noted, Local Civil Rule 56.1 requires that the movant file a "short and concise statement ... of the material facts as to which the moving party contends there is no genuine issue to be tried," and further provides that each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph" that "contain[s] a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(a)-(c). Statements and counterstatements alike must be supported by citations to admissible evidence. *Id.* at 56.1(d). Reviewing these materials, a district court "must ask not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). Credibility assessments and the resolution of conflicting versions of events are questions for a jury. *Id.*

When a party fails to produce any specific, legally-relevant facts to support their case, a district court may, in its discretion, grant summary judgment prior to discovery. *See Contemporary Mission, Inc.* v. *U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981). A party's mere hope that further evidence supporting its claims or defenses may develop prior to trial is an insufficient basis on which to justify denial of summary judgment. *Id.* (quotation omitted). Where a non-movant simply relies on bare allegations,

dismissal is appropriate prior to discovery.  *Eastway Constr. Corp.* v. *City of New York*, 762 F.2d 243, 251 (2d Cir. 1985) ("A bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment.").

### d. Deferral of Summary Judgment Motions Pending Discovery

In opposing WPC's motion, Bigler invokes Federal Rule of Civil Procedure 56(d), which provides:

> (d) When Facts Are Unavailable to the Nonmovant.  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Discussing the analytically-similar predecessor rule to Rule 56(d), Rule 56(f), the Second Circuit instructed that:

> A court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered.  "Rule 56(f) is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative," and a "'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)."

*Paddington Partners* v. *Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (citations omitted); *accord Alphonse Hotel Corp.* v. *Tran*, 828 F.3d 146, 151 (2d Cir. 2016); *see generally Nationwide Sales & Servs. Inc.* v. *Envirocare Techs. Int'l, Ltd.*, No. 16 Civ. 6617 (GRB), 2018 WL 2436969, at *8 (E.D.N.Y. May 30, 2018) (collecting cases under Rules 56(d) and 56(f) where the Second Circuit has found affidavits to be insufficient).

### 2.    Discussion

WPC argues that the relevant evidence admits of no other conclusion but that Bigler is bound by the Letter Agreement not to bring the claims she raises in the FINRA arbitration.  (Pl. Br. 10-21).  Pursuant to an employment agreement that had been in place for two years, Bigler left Carey Financial at the end of April 2017, and executed the Letter Agreement as part of her departure with full knowledge of its contents.  The WARN Act claims raised now by Bigler are, in WPC's estimation, red herrings that do not detract from the enforceability of the Letter Agreement.  The announcement that triggered WARN Act obligations — the partial closure of Carey Financial — was decided upon and communicated to affected employees and agencies on June 15, 2017, at which time Bigler was not an employee.  Conversely, prior to June 15, 2017, there was no decision to close or downsize Carey Financial, and thus nothing to communicate to Bigler.  There being no basis for a fraudulent inducement claim, WPC's argument concludes, the Letter Agreement is enforceable and should be enforced.

Bigler resists summary judgment on the grounds that WPC's motion is premature, and that she needs discovery to gather facts regarding, among other things, "when discussions regarding the reduction in force began, when the decision was made to conduct a reduction in force, [and] the reasons for Bigler's termination which appear to be based upon fraud." (Def. Reply 15; *see* Bigler Decl. ¶ 40). Bigler deems the following issues of fact to be material for Rule 56 purposes: whether her two-year position as Ameriprise Ambassador was really limited to two years; whether the Letter Agreement was supported by adequate consideration; whether she was fraudulently induced to sign the Agreement; when the decision to conduct a reduction in force was made by WPC; and whether she was an "affected employee" entitled to WARN notice. (Def. Reply 16-21). For the reasons set forth in the remainder of this section, Bigler fails to raise a dispute sufficient to forestall summary judgment.

### a. Bigler Has Not Raised a Genuine Dispute of Fact as to Her Entitlement to WARN Notice

Many of Bigler's proffered disputes of material fact are dependent on the invalidity of the Letter Agreement and its release and waiver of suit provision. Generally speaking, covenants not to sue (and releases of claims) requiring that an obligor forbear from bringing any current or future claims against an obligee are valid under New York law. *See, e.g.*, *Kamfar* v. *New World Restaurant Group, Inc.*, 347 F. Supp. 2d 38 (S.D.N.Y. 2004); *Wilder* v. *Pa. R.R. Co.*, 245 N.Y. 36, 39 (1927); *McMahan & Co.* v. *Bass*, 673 N.Y.S.2d 19, 21 (1st Dep't 1998). Indeed, a party's release of claims "may [not] be treated lightly." *Mangini* v. *McClurg*, 24 N.Y.2d 556, 563 (1969). A release of claims that is clear and

unambiguous on its face and that is knowingly and voluntarily entered into is binding on the parties, absent a showing of fraud, duress, undue influence, or other valid defense. *Nasik Breeding & Research Farm Ltd.* v. *Merck & Co., Inc.*, 165 F. Supp. 2d 514, 526 (S.D.N.Y. 2001) (citing *DuFort* v. *Aetna Life Ins. Co.*, 818 F. Supp. 578, 581 (S.D.N.Y. 1993)).

Although a release may be ineffectual if it is shown to have been procured by fraud or duress, conclusory allegations of fraudulent inducement are insufficient to overcome a release's unambiguous language. *See N.Y.C. School Constr. Auth.* v. *Koren-DiResta Constr. Co.*, 671 N.Y.S.2d 738 (1st Dep't 1998) (citing *Fleming* v. *Ponziani*, 24 N.Y.2d 105 (1969)). Instead, a claim for fraudulent inducement requires some showing that: "[i] the defendant made a material false representation, [iii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996); *accord Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005); *Vermeer Owners, Inc.* v. *Guterman*, 78 N.Y.2d 1114, 1116 (1991) (holding that a fraud action requires proof of "a representation of material fact, falsity, scienter, reliance and injury").

Bigler asserts that WPC and Carey Financial fraudulently induced her to sign the Letter Agreement by failing to inform her in April 2017 of the upcoming plans to reduce the work force at Carey Financial. Indeed, Bigler argues that parent and subsidiary engaged in a concerted effort to persuade

her to leave before she could learn about, and partake of, enhanced severance benefits. (Def. Reply 18-20; Bigler Decl. ¶ 37). These arguments, however, fail if Bigler had no entitlement to WARN notice at the time of her departure. The evidence before the Court demonstrates beyond credible dispute that she was not so entitled.

The evidence is overwhelming that WPC did not decide to conduct a reduction in force at Carey Financial until June 15, 2017, and that it gave notice the same day to the affected employees and the NYDOL, as required by the WARN Act. (*See* Pl. Br. 12; Miller Decl. ¶ 11; Hyde SJ Decl. ¶¶ 5-8). To begin, the NYDOL notice and WPC's press release are dated June 15, 2017 (Hyde SJ Decl., Ex. C, D); the press release explicitly states that WPC was "announc[ing] *today* that its Board of Directors has approved a plan to exit all non-traded retail fundraising activities" (*id.*, Ex. D (emphasis added)). WPC has also submitted declarations from individuals on both sides of the decision: From the management perspective, Chief Administrative Officer Susan Hyde avers that (i) "WPC's Board of Directors did not make the decision to go forward with the RIF until the morning of June 15, 2017"; and (ii) "[n]o notice of the RIF was given to employees or regulators prior to June 15, 2017." (*Id.* at ¶¶ 6-7). From the affected employee perspective, former Carey Financial CEO Trisha Miller — who, it bears noting, supervised Bigler and conducted the severance discussions with her — avers that she heard nothing regarding even the possibility of a reduction in force until June 8, 2017, and that she and all other

affected Carey Financial employees received their WARN Act notices on June 15, 2017. (Miller Decl. ¶¶ 10-11).

Bigler responds with assertions on information and belief about "internal meetings and discussions" and "talks" regarding potential reductions in force at Carey Financial. (*See* Bigler Decl. ¶¶ 30-31). These are insufficient to raise a genuine dispute of fact. For starters, Bigler's briefing makes obvious that her claim of entitlement to WARN notice is the product of reverse-engineering putative dates of notice under the WARN Act based on WPC's announcement date.[8] However, these calculations misperceive both the NYDOL notice, which clarified that layoffs would take place over a period of time extending until September 29, 2017 (Hyde SJ Decl., Ex. D), and the law, which permits affected employees to receive payment in lieu of notice. *See* 29 U.S.C. § 2104(a); N.Y. Lab. Law § 860-g(1).

More fundamentally, the "talks" and "internal meetings" to which Bigler refers are irrelevant under the WARN Act. The obligation to provide WARN notice or to provide pay in lieu of notice is not triggered until a decision has been made to *do* something — in this case, to order a mass layoff at Carey Financial. *See* 29 U.S.C. § 2102 ("An employer *shall not order* a plant closing

---

[8] See Def. Reply 21:

> Here, the notice requirement was triggered on June 15, 2017 when the RIF was announced, and so Carey Financial was required to provide notice at least 90 calendar days prior to the RIF, i.e., by March 17, 2017, and at such time, Bigler was still an employee. Even under the federal WARN laws, where notice is required at least 60 days prior, i.e., by April 16, 2017, Bigler was still an employee.

or mass layoff until the end of a 60-day period after the employer serves written notice of such an order[.]" (emphasis added)); N.Y. Lab. Law § 860-b(1) ("An employer *may not order* a mass layoff, relocation, or employment loss, unless, at least ninety days before the order takes effect, the employer gives written notice[.]" (emphasis added)). And for this reason, Bigler has failed to satisfy the requirements of Rule 56(d). There is not now, and Bigler has not demonstrated that additional discovery will disclose in the future, a genuine dispute of material fact regarding the date on which the decision was made to effect the Carey Financial layoffs. That date was June 15, 2017, and Bigler was not then an affected employee.

Bigler's second fraudulent inducement argument is that WPC and Carey Financial were motivated to get rid of her in April 2017, in order to deprive her of additional compensation. (Def. Reply 19; Bigler Decl. ¶ 39). There is reason to be skeptical of such an argument, which presupposes that WPC and Carey Financial would assume WARN Act responsibilities for 60 employees, but single out Bigler as the one Carey Financial employee to be deprived of any benefits. And, as it happens, the argument fails as a matter of law, because there is no evidence from which a WARN Act notice requirement can be inferred back in April 2017.

But the argument also fails because there is no genuine dispute that Bigler's employment with Carey Financial ended, by design, after two years on April 30, 2017. (*See* Miller Decl. ¶¶ 3-9 & Ex. B; *see also id.*, Ex. A). Plaintiff has put forward neither evidence nor argument why the Court should not take

her two-year employment contract at face value, as a position lasting two years. After all, the position that she accepted was a limited position that focused on commemorating the 25th anniversary of the Ameriprise customer relationship; it is exceedingly unlikely that a similar position would be available for subsequent, less significant anniversaries. And the agreement also makes clear that at the end of the two-year period, Carey Financial "would consider whether *any new position* might be available at the end of the second year" (*id.*, Ex. B), but not whether the position itself would continue.

Even if Carey Financial, WPC, or anyone else had given Bigler the impression, in discussions prior to her acceptance of the position, that it "would be a *minimum* two-year position" (Bigler Decl. ¶ 20), that impression would have been dispelled by the language of the agreement (Miller Decl., Ex. B), which contained no such provision. It was certainly dispelled by the Letter Agreement, which contained a merger and integration clause. (*Id.*, Ex. A at ¶ 6 ("This letter agreement represents the entire agreement between the parties as to the subject matters herein and supersedes all prior and contemporaneous understandings and agreements with respect thereto.")).

In any event, there was no discrepancy between the offer and the Letter Agreement; to the contrary, the offer was explicitly "modified to incorporate [Miller's and Bigler's] recent discussions and [was] meant to summarize and memorialize the terms of the opportunity." (Miller Decl., Ex. B). And Miller reminded Bigler that her "employment relationship with [Carey Financial] would come to an end at the conclusion of the two-year period," after which

Carey Financial would "consider whether any new position might be available" at that time. (*Id.*). This language is unambiguous. Bigler was hired for a two-year position beginning in April 2015. And Bigler has failed to identify a genuine dispute of fact that her termination resulted from anything other than the expiration of that two-year period.[9]

Whether viewed from the timeline of the decision to lay off Carey Financial employees, or from the timeline of her employment at Carey Financial, Bigler had no entitlement to WARN notice as a matter of law. Failing to inform Bigler of an undecided-upon reduction in force eight weeks before any other employees were told of the reduction — for a reduction in force that would not have affected Bigler anyway — is not fraudulent inducement.

### b. Bigler Has Not Raised a Genuine Dispute Concerning Lack of Consideration

Bigler also argues that the release of claims provision in the Letter Agreement is should be invalidated for lack of consideration, and that this constitutes a material question of fact sufficient to stave off summary judgment. (Def. Reply 17-18). She claims that continued health benefits from April 2017 to November 2017 "were benefits to which [she] was already entitled in conjunction with the Ameriprise Ambassador position," so there was no consideration for the Agreement. (Bigler Decl. ¶ 42).

---

[9] The Court need not reach — but notes the persuasive force of — WPC's argument that Bigler ratified the Letter Agreement anyway by failing to repudiate the contract and, instead, choosing to bring suit one day after her health benefits ended. (*See* Pl. Br. 17-19).

Under New York law, lack of consideration is not a ground upon which to invalidate a release of claims, so long as the release is given in writing. *See* N.Y. Gen. Oblig. Law § 15-303 ("A written instrument which purports to be a total or partial release of all claims ... shall not be invalid because of the absence of consideration[.]"); *accord Arneberg* v. *Georges Berges Galleries, LLC*, No. 16 Civ. 8955 (AJN), 2018 WL 1449151, at *6 (S.D.N.Y. Mar. 22, 2018); *Dozier* v. *Deutsche Bank Tr. Co. Am.*, No. 09 Civ. 9865 (LMM), 2011 WL 4058100, at *4 (S.D.N.Y. Sept. 1, 2011); *Sedona Corp.* v. *Ladenburg Thalmann & Co.*, No. 03 Civ. 3120 (LTS), 2009 WL 1492196, at *2 (S.D.N.Y. May 27, 2009).

Given the failure of Bigler's proffered bases of invalidation, and given further Bigler's failure to demonstrate that additional discovery would identify a genuine dispute of fact, this Court finds that summary judgment in favor of WPC is warranted, because there is no basis on which to invalidate Bigler's Letter Agreement, including its release and waiver of suit provision that applies to Carey Financial and "each of its current and former parents, subsidiaries, affiliates, predecessors and successors." (Miller Decl., Ex. A). The Court finds as well that Bigler's filing of an arbitration against WPC was a violation of her commitments under the Letter Agreement. WPC's motion for summary judgment is granted.

## CONCLUSION

For the reasons stated in this Opinion, Plaintiff's motion for summary judgment is GRANTED on its claim that Defendant breached the release and

covenant not to sue contained in the Letter Agreement; Defendant's motion to arbitrate is DENIED; and Defendant's motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motions at docket entries 23 and 27. Plaintiff is ORDERED to submit a letter to the Court, on or before **April 12, 2019**, to advise the Court whether it wishes to proceed further on its claims for damages and attorneys' fees.

SO ORDERED.

Dated:   March 27, 2019
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge